IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

VICENTE GARCIA,                    )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )        Case No. 09-cv-1018-MJR-DGW
                                   )
TA OPERATING LLC,                  )
                                   )
                    Defendant.     )

<u>MEMORANDUM AND ORDER</u>

REAGAN, District Judge:

### A.        Introduction and Procedural Overview

Vicente Garcia worked in Mt. Vernon, Illinois as a technician for TA Operating LLC, which does business as Travel Centers of America (referred to herein simply as "TA"). TA operates service centers that offer diesel fuel, gasoline, restaurants, convenience stores, and truck repair/maintenance services. Garcia was one of sixteen automotive technicians working at TA's Mt. Vernon facility.

In his March 2010 amended complaint, Garcia alleged that TA refused him training needed to advance in his job and ultimately terminated his employment based on his race (Hispanic), thereby discriminating against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The complaint also fleetingly references a violation of the Illinois Human Rights Act (IHRA), 775 ILCS 5/1-101, *et seq.*[1]

---

[1]        The "Nature of the Action" in the amended complaint states that this action is brought under both Title VII and the IHRA (Doc. 21, p. 1), and Defendant's summary judgment motion repeats this statement. However, other than a request for

TA answered the complaint March 30, 2010.  The case is set for jury trial January 24, 2011 with a January 21, 2011 final pretrial conference.  The parties had an October 15, 2010 dispositive motion deadline.  One timely-filed motion, fully briefed as of December 13, 2010, comes now before the Court – TA's motion for summary judgment (Doc. 38).  For the reasons stated below, the Court grants the motion.

### B.    Standard Governing Summary Judgment Motions

Summary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *Turner v. The Saloon, Ltd.,* **595 F.3d 679, 683 (7th Cir. 2010);** *Durable Mfg. Co. v. U.S. Department of Labor,* **578 F.3d 497, 501 (7th Cir.  2009),** *citing* FED. R. CIV. P. 56(c).  *Accord Levy v. Minnesota Life Ins. Co.,* **517 F.3d 519 (7th Cir. 2008);**  *Breneisen v. Motorola, Inc.,* **512 F.3d 972 (7th Cir. 2008),** *citing Celotex Corp. v. Catrett,* **477 U.S. 317, 322-23 (1986).**

In ruling on a summary judgment motion, the district court must construe all facts in the light most favorable to, draw all legitimate inferences in favor of, and resolve all doubts in favor of the non-moving party.  ***National Athletic Sportswear, Inc. v.***

---

prejudgment interest under the Illinois statute, the one-count amended complaint is silent as to the IHRA.  The complaint alleges: "This action is authorized and instituted pursuant to Title VII" (Doc. 21, p. 1); TA is an employer within the meaning of Title VII (*id.,* p. 2); the conduct of Defendant's supervisors "constitutes race discrimination in violation of ... Title VII" (*id.,* p. 5); and the Court should find Defendant "in violation of Title VII" (*id.*).

*Westfield Ins. Co.*, **528 F.3d 508, 512 (7ᵗʰ Cir. 2008).   Accord *Reget v. City of La Crosse*, 595 F.3d 691 (7ᵗʰ Cir.  2010); *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7ᵗʰ Cir. 2007).**

When the non-moving party bears the burden of proof, though, he must demonstrate the existence of a genuine fact issue to defeat summary judgment. ***Reget*, 595 F.3d at 695.**  To survive summary judgment, the non-movant must provide admissible evidence on which the jury or court could find in his favor.  ***See Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7ᵗʰ Cir. 2008).**

In deciding a summary judgment motion, the court may not evaluate the weight of the evidence,  judge the credibility of witnesses, or determine the truth of the matter.  The court's only role is to determine whether there is a genuine issue of triable fact. ***National Athletic*, 528 F.3d at 512, *citing Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).**  As the Seventh Circuit Court of Appeals succinctly stated last month: "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." ***Van Antwerp v. City of Peoria, Illinois*, – F.3d –, 2010 WL 4923560, *2 (7ᵗʰ Cir. Dec. 6, 2010); *quoting Brewer v. Board of Trustees of the University of Illinois*, 479 F.3d 908, 915 (7ᵗʰ Cir. 2007).**

Stated another way, summary judgment is the "put up or shut up" moment in litigation – the point at which the non-movant must marshal and present to the court the admissible evidence which he contends will prove his case. ***Goodman v. National Security Agency, Inc.*, 621 F.3d 651, 654 (7ᵗʰ Cir. 2010), *citing Everroad v. Scott Truck Systems, Inc.*,**

604 F.3d 471, 476 (7th Cir. 2010), *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009), and

*AA Sales & Associates, Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 613 (7th Cir. 2008).  With these

principles in mind, the Court turns to the motion in the instant case.

        C.      <u>**Analysis**</u>

        ▶      SUMMARY OF PLAINTIFF'S CLAIMS

Title VII prohibits workplace discrimination in the compensation, terms,

conditions, or privileges of employment based on an employee's "race, color, religion, sex,

or national origin." **42 U.S.C. § 2000e-2(a)(1).**   In the instant case, Vicente Garcia asserts

two race discrimination claims – a failure-to-train claim and a discharge claim.

First, he alleges that from April 1, 2005 through July 17, 2008, TA refused to

allow him to take classes needed to advance his position and increase his compensation,

based on the fact he is Hispanic (Amended Complaint, Doc. 21, p. 3).  Second, Garcia

alleges that – through the actions of supervisor Howard Chambliss – TA terminated

Garcia's employment on July 17, 2008, based upon his race (*id*.).  Although the complaint

only mentions one supervisor ("Howard Chamber"), apparently discovery clarified and

broadened the allegation to include the actions of *two* supervisors.  The parties' briefs focus

on the actions of two TA managers – Howard Chambliss (presumably the corrected name

of "Howard Chamber") and Kevin Spain.

        ▶      UNDISPUTED MATERIAL FACTS

The voluminous record before the Court, including deposition excerpts,

sworn declarations, and numerous exhibits, disclose the following undisputed key facts.

The part of TA's Mt. Vernon facility that performs truck repair and maintenance is referred to as "the Shop."  At the times pertinent to this lawsuit, Plaintiff Garcia worked in the Shop.  The two Assistant Shop Managers in the Mt. Vernon Shop are Kevin Spain and James Ramirez.  The General Manager of the Mt. Vernon Shop is Howard Chambliss.  Chambliss reports to Roger Lister, the Field Manager, who oversees six TA locations.  Lister reports to Mark Camp, whose title is Director of Truck Service.

Chambliss first met Vicente Garcia when visiting an AutoZone store as a customer.  Garcia waited on Chambliss there.  Chambliss later called Garcia and offered him a job at TA.

Garcia was hired in May 2005 as a Truck Service Advisor or "TSA," a position that involves working the parts counter, signing in trucks that come to the Shop for service, and running the cash register.  Several months after starting work, Garcia expressed a desire to become a technician, despite the fact he had not had any formal training as a mechanic.  To become a technician at TA, applicants must pass a test.  Garcia did not pass the qualifying test on his first try. But Chambliss secured permission for Garcia to re-take the test.  Chambliss also assigned Kevin Spain to assist Garcia in preparing for the test.  Garcia passed the test on his second try, and he was offered the technician's job.

TA has seven levels of technicians, denominated "Tech 1" through "Tech 7." Tech 1s earn a commission of 38% of any labor sales they generate.  The commission percentages rise by 1% per each higher tech level.

Garcia started as a Tech 1.  His job duties included performing preventative

maintenance (like oil changes) and tire service. Garcia received training on how to perform these services, and he was informed of the procedures and requirements for completing a certain checklist as part of any oil change – the "PM Checklist."

Garcia was promoted to Tech 2, where he earned commissions of 39% of labor sales and was responsible for performing preventive maintenance, tire service and wheel service. Garcia's race discrimination claim based on failure to train rests on the premise that TA failed to promote him to Tech 3. Tech 3s earn commissions of 40% of labor sales.

To advance to Tech 3 (at the relevant time period to these allegations), a technician had to complete Department of Transportation training and attend a formal electrical class at a TA technician training location outside of Illinois ("Electrical Training Class").[2] TA's Corporate Training Department selected technicians to attend Electrical Training Class. That selection process was based on a system which, *inter alia*, gave priority to technicians who needed to satisfy requirements for the position they *currently* held (so-

---

[2]     TA's Corporate Training Department offered three classes at designated training locations: (1) Electrical Training, (2) Air/ABS Brakes Training, and (3) HVAC Training. The locations include Nashville, TN; Oklahoma City, OK; Lodi, OH; Bloomsberg, PA; Troutdale, OR; and Atlanta, GA. The Electrical Training Class is at issue herein. The Corporate Training Department never selected Garcia to attend the Electrical Training Class. Garcia claims that was due to his race (Hispanic). TA (a) maintains that Garcia was not eligible for the requested training, and (b) submits evidence that *no technicians* from the Mt. Vernon facility were selected to attend Electrical Training Class from October 17, 2007 through July 17, 2008. *See* Doc. 39-7, Declaration of Mark DeLima, Manager of Field Training.

called "Catch Up" training).  Vicente Garcia was not eligible for Catch Up training during his employment at TA, because he already *had* the required training for his current position.  It remained possible for him to secure a spot in the Electrical Training Class, however, by being placed on a wait list, in case there was a last-minute cancellation for a class at a location within driving distance of the Mt. Vernon facility (*see* Doc. 39-7, Declaration of Mark DeLima).

In light of the fact that seats in these classes were limited, TA permitted technicians to be promoted to Tech 3 *without* attending Electrical Training Class, if they attained electrical certification from the National Institute for Automotive Service Excellence or "ASE."  In fact, TA encouraged its technicians to obtain ASE certifications. If the technician passed a pre-test, TA paid the registration fee for the ASE test.  And if the technician passed the ASE test, TA paid the technician a $125 incentive bonus.  From May 2005 through May 2008, eleven employees at TA's Mt. Vernon facility passed ASE certification tests (*see* Doc. 39-7, p. 5).

As discussed further below, Garcia wanted to attend Electrical Training Class to get promoted to Tech 3 and earn more commission.   In 2007, Kevin Spain emailed the Corporate Training Department requesting that Garcia and two other employees be permitted to attend Electrical Training Class.  Garcia and the two co-workers were placed on the wait list for cancellations, but no seats opened up for the class within driving distance of the Mt. Vernon facility.  Garcia never attempted to obtain his ASE certification (to secure promotion via that route, instead of through Electrical Training Class).

One of Garcia's duties was to perform oil changes.  One step in this process involved the technician reinserting the oil pan plug and torquing or tightening it.  The technician must have a second technician verify that the plug is properly torqued.  Additionally, if the truck's driver is available, the technician should have the driver verify that the oil pan plug is tight.

Garcia was aware of these requirements and aware that, as part of an oil change, he must complete the PM Checklist.  The PM Checklist has a spot where the second technician and truck driver signify their verification of the plug tightening.  These requirements appear in TA's written policy regarding "Assurance Checks."  Garcia acknowledged that this policy was explained to him in training he received and that he also understood from the PM Checklist itself that a second technician must verify the oil pan plug tightening.

On July 12, 2008, Garcia performed an oil change on a vehicle referred to as "Tractor #16021."  On the PM Checklist, Garcia initialed as the first Tech but did not have a second technician or the truck driver verify that the oil pan plug was properly tightened.  Later, the driver of Tractor #16021 called TA and spoke to James Ramirez (an Assistant Manager in the Mt. Vernon Shop).  The driver told Ramirez that 30 or 40 miles down the interstate, his oil pan plug fell out, the engine lost all of its oil, and the engine shut down.  The driver did not own the truck; it was a fleet vehicle.

Ramirez had the truck towed to a nearby Freightliner dealership and reported the situation to his supervisor, Howard Chambliss.  Ramirez also emailed

Chambliss' supervisor, Roger Lister (Field Manager for the Shops in six TA sites, including Mt. Vernon, Illinois).

Chambliss went to Freightliner and inspected the truck. He confirmed that the engine had no oil in it, the oil pan plug was missing, and the oil pan was not otherwise defective or damaged (e.g., the pan showed no signs of "cross-threading")(Chambliss Deposition, pp. 62-65; Doc. 39-2, p. 17). The technicians at Freightliner similarly inspected the engine and observed the lack of oil and the missing plug. Chambliss reported his observations.

Lister instructed Chambliss to determine which technician performed the oil change. Chambliss pulled the PM Checklist and work order for the job. Chambliss told Lister that the PM Checklist had not been properly filled out – there was no second set of initials to verify proper tightening of the oil pan plug. Lister then called his boss, Mark Camp, and explained that TA would have to buy a new motor for the truck, because no one could verify proper torquing of the oil pan plug. TA paid $10,616.80 for repairs to the truck resulting from the claim for the botched oil change (*see* Doc. 39-2, p. 18; Doc. 39-1, p. 3).

Camp told Lister to terminate the technician who performed the oil change. Lister then instructed Chambliss to fire Garcia. On July 16, 2008, Chambliss sent Lister an email, noting that Garcia had been a "great employee" other than being tardy for work sometimes (Chambliss Declaration ¶ 16; Doc. 39-1, p. 3; Doc. 39-1, p. 6). Chambliss testified that his email to Lister was an effort to save Garcia's job. Garcia vehemently contests that Chambliss had any such motivation when he emailed Lister on July 16th.

The email is part of the record before the Court and, in its entirety, reads

(Doc. 39-1, p. 6, emphasis added):

> Roger Lister
> 07/16/2008 01:38 PM
>
> Roger the tech that did the oil change was Vicenta Garcia
> he has been with us over 3 years, we hired him in may of 2005.
> he is at tech level 2.
> He has had 5 effective and one outstanding eval.
> he has had one warranty in this time, it was a electrical trl work
> that cost us $37.00 in dec of last year year. [sic]
> **I understand the deal we are in but he has been a great employee**
> **outside of having a bit of trouble getting to work on time.**
> year to date he has brought in $42,034.23 in labor sales.
> I understand we have to do what we are told, I just wanted
> to let you know who the tech is.
>
> Howard
> #43

As mentioned above, Garcia challenges Chambliss' testimony that he sent this email to try to save Garcia's job. The disagreement as to *why* Chambliss referred to Garcia as a "great employee" in the email to Lister does *not* constitute a genuine issue of material fact. What is beyond dispute is that Chambliss notified Lister of the identity of the technician who performed the oil change (Garcia), and **Lister** ordered Chambliss to terminate Garcia. Chambliss did so the following day, on July 17, 2008.[3]

---

[3] The records (and Garcia's own amended complaint) indicate Garcia was fired on July 17, 2008. The records further indicate that the oil change in question was performed on July 12, 2008 (*see, e.g.*, "Separation Report, Doc. 39-5, p. 141, and service records for oil change, Doc. 39-5, p. 138). But Garcia insisted in deposition that he was fired the same day he performed the oil change (*see* Garcia Depo. pp. 222-227;

In his deposition, Garcia acknowledged that Chambliss told him he was being terminated because he (Garcia) did not properly torque an oil pan plug while doing an oil change, and the plug fell out of the truck 40 miles down the road.  Chambliss told Garcia that he tried to save his job, but Lister directed him to fire Garcia.  Garcia rejects the idea that he was fired based on the allegedly faulty oil change.  He believes TA was looking for a reason to terminate him and possibly someone at TA was "working together" with the truck driver to "set up" the incident (*see* Garcia Depo., pp. 89-90; Doc. 39-5, p. 24; Memo Opp. Summary Judgment, Doc. 44, p. 4).

Garcia does not contend that Mark Camp or Roger Lister are prejudiced against Hispanics.  (This is significant, because they are the "decision makers" in the case at bar.)  Garcia asserts only that Howard Chambliss and Kevin Spain discriminated against him based on his race.  Garcia believes he was denied training based on the fact he was Hispanic, and that TA should have issued him a verbal warning or suspended him (not fired him) following the oil change incident.

▶   **PLAINTIFF'S FAILURE-TO-TRAIN CLAIM**

Garcia maintains that TA provided "no reason for its refusal to allow Plaintiff to take said classes, and other non-Hispanic employees were allowed by Defendant to take said classes and advance their position" (Amended Complaint; Doc. 21, p. 3), and this conduct constitutes race discrimination in violation of Plaintiff's rights under Title VII (*id*, p. 5).

---

Doc. 39-5, pp. 57-58).

A Title VII plaintiff may attempt to prove race discrimination two ways – via the direct method or the indirect method. ***Weber v. University Research Association, Inc.,*** **621 F.3d 589, 592 (7th Cir. 2010).**  To prove a case under the direct method, the employee must provide direct evidence of – or enough circumstantial evidence to allow an inference of – intentional race-based discrimination by his employer.  Whichever type of evidence he chooses to present, the employee may avoid summary judgment only by "presenting sufficient evidence to create a triable issue as to whether his [termination or demotion, etc.] had a discriminatory motivation."  ***Montgomery v. American Airlines, Inc.,*** **626 F.3d. 382, 393 (7th Cir. 2010).**

Garcia purports to proceed via the <u>direct method on his failure-to-train claim</u>, offering what he characterizes as direct *and* circumstantial evidence of intentional race-based discrimination by TA.  He relies primarily on several derogatory statements by Kevin Spain and Howard Chambliss, who allegedly joked to Garcia about not being able to read and write English, called Garcia a "taco" or "burrito," and remarked (in the context of training classes) "they won't let little Puerto Ricans in places like that" (Garcia Depo., pp. 72-75; Doc. 39-5, pp. 19-20).  Garcia also argues that he was not given training while other TA technicians were.  As is described below, the Court finds no direct evidence of race-based denial of training opportunities.

One preliminary matter bears note.  TA stresses that Garcia's deposition testimony (his first mention of any negative comments about his race) flatly contradicts his prior sworn statements (interrogatory answers in which Plaintiff described all incidents

forming the basis of his denial-of-training claim).  TA asks the Court to not even consider Spain's alleged comments, based on this contradiction.

Garcia's answer to Interrogatory #3 states that "Defendant provided Plaintiff **no reason for its refusal** to allow Plaintiff to said classes...." (Doc. 39-11, p. 2; emphasis added).  It is true that this sworn statement (that TA provided "no reason" for failing to send Garcia to Electrical Training Class) is contradicted by Garcia's July 2010 deposition testimony that, when he applied to attend the classes, Spain said "they don't want no tacos over there," and that Chambliss (who had brought Garcia to TA from Auto Zone) at some point called Garcia "taco" or "burrito."

The law of this Circuit holds that a Title VII plaintiff cannot defeat summary judgment by introducing new sworn statements which contradict his own prior sworn statements.  For instance, in *LaFary v. Rogers Group*, 591 F.3d 903, 908 (7th Cir. 2010), the Court of Appeals emphasized that a plaintiff could not avoid summary judgment by filing an affidavit that countered her earlier deposition testimony.  Likewise, in *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005), the Seventh Circuit announced:

> Although at the summary judgment stage we must interpret the evidence in the light most favorable to Ineichen, ... that does not allow her to contradict deposition testimony with later-filed contradictory affidavits.... "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions.... If such contradictions were permitted ... 'the very purpose of the summary judgment motion - to weed out unfounded claims, specious denials, and sham defenses - would be severely undercut.' " *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir.1996). Because Moulton unequivocally testified in her deposition that Williams and

Shaw never commented on the fact that Jones was black and Ineichen white, we reject Ineichen's attempt to create an issue to avoid summary judgment with a newly filed affidavit which contradicts her earlier testimony.

There is substance to TA's argument that Garcia ought not be allowed to circumvent summary judgment by offering recent deposition testimony regarding derogatory race-based comments allegedly made by two TA managers about why Garcia was not sent to the training classes he wished to take. But detailed deposition testimony sometimes fleshes out bare-bones interrogatory answers. More importantly, even if the Court considers Garcia's deposition testimony, the comments by Spain and Chambliss do not defeat summary judgment.[4]

The Seventh Circuit recently reminded District Courts that discrimination evidence offered under the direct method "must itself show that the decision maker acted because of the prohibited animus." *Van Antwerp*, **2010 WL 4923560 at \*3 (7th Cir. Dec 6., 2010)**, *quoting Venturelli v. ARC Community Services, Inc.,* **350 F.3d 592, 601 (7th Cir. 2003).** The law of this Circuit provides that "stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus."

---

[4]       TA also persuasively argues that part of Garcia's failure-to-train claim is barred by the applicable statute of limitations (*see* Doc. 39, p. 19). Garcia counters by invoking the continuing violation doctrine, citing a 1985 Seventh Circuit case and a 1986 Northern District of Illinois decision (*see* Doc. 44, p. 11). Assuming, *arguendo*, that the statute of limitations does *not* bar any part of Garcia's failure-to-train claim, it fails as a matter of law.

*Hemsworth v. Quotesmith.Com, Inc.* 476 F.3d 487, 491 (7ᵗʰ Cir. 2007), *citing Merillat v. Metal Spinners, Inc.,* 470 F.3d 685, 694 (7ᵗʰ Cir. 2006), *cert. denied,* 551 U.S. 1130 (2007), **and** *Cullen v. Olin Corp.,* 195 F.3d 317, 323 (7ᵗʰ Cir. 1999), *cert. denied,* 529 U.S. 1020 (2000).

A particular remark can furnish an inference of discrimination only if it was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action. *Hemsworth*, 476 F.3d at 491, *citing Hunt v. City of Markham, Illinois*, 219 F.3d 649, 652-53 (7ᵗʰ Cir. 2000). The first of these requirements poses the obstacle here.

Like the comments in *Hemsworth*, the remarks relied on by Garcia in the instant case do not pass this test and thus are "properly rejected by the district court." *Id.* There is no evidence whatsoever that Spain or Chambliss "exercised a significant degree of influence over the contested decision" (here, whether to send Garcia to training). *Egonmwan v. Cook County Sheriff's Dept.,* 602 F.3d 845, 850 (7ᵗʰ Cir. 2010), *citing Sun v. Board of Trustees*, 473 F.3d 799, 813 (7ᵗʰ Cir.), *cert. denied,* 551 U.S. 1114 (2007).

To the contrary, the record (viewed in the light most favorable to Garcia) reveals that the decision whether to send TA employees to training was entirely and exclusively the province of the Corporate Training Department (*see* Declaration of Mark DeLima, Manager of Corporate Training, Doc. 39-7, pp. 2-4). Neither Spain nor Chambliss could or did influence that decision. All they could do was *request* that one of their technicians be placed on a wait list (i.e., assigned a seat in a training class within driving distance of their facility, if a last-minute cancellation freed up a spot).

The undisputed record shows that Kevin Spain made this request on behalf of Garcia.  Neither Kevin Spain nor Howard Chambliss was the "decision maker" as to whether Garcia could attend the Electrical Training Class, so the Court goes no further in assessing this purported direct evidence on the failure-to-train claim.

To summarize, there is no admission from TA that it declined to train Garcia based on his race.[5]  The derogatory comments allegedly made by Spain and Chambliss are not remarks made by a decision maker, and they are not properly *imputed* to a decision maker.  In ***Thompson v. Memorial Hospital of Carbondale*, 625 F.3d 394, 404 (7th Cir. 2010),** the Seventh Circuit explained:

> when an employee is not a decision maker, her animus is relevant only if she exerted such influence over the decision that her animus can be imputed to the decision maker.  *Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 508 (7th Cir. 2010)....

> Particularly relevant here, we have noted that singular influence may be exercised by, among other things, "supplying misinformation or failing to provide relevant information to the person making the employment decision."  *Brewer v. Bd. of Trs. of Univ. of Ill.,* 479 F.3d 908, 917 (7th Cir. 2007).

In the case at bar, the determination of which employees to send to Electrical Training Class was made solely and entirely by the Corporate Training Department (specifically, by Manager Mark DeLima).  Spain and Chambliss played no consequential

---

[5]     Indeed, the deposition testimony, sworn declarations and employee handbook (Doc. 39-5, p. 79) indicate that TA provides training opportunities to its employees (the so-called "Train to Gain" program) without regard to race.

role in this process, whatever they believed as to Garcia's qualifications and whatever they allegedly said (jokingly or maliciously) regarding Garcia's race. No reasonable jury could find that the training decisions herein were the product of singular influence by Chambliss or Spain. Seventh Circuit law precludes this Court from treating Spain or Chambliss's statements as probative of an intent to discriminate on the part of TA.

Similarly unavailing is the circumstantial evidence Garcia offers under the direct approach to proving his failure-to-train claims. The relevant circumstantial evidence in discrimination cases ordinarily falls into two general categories, one of which is "evidence of systemically better treatment of employees outside the protected class." *Montgomery*, 626 F.3d at 393. That is what Garcia relies on here, but the record (construed in the light most favorable to Garcia) does not support the assertion that Garcia was excluded from training provided to other non-Hispanic technicians in his position.

In his deposition, Garcia testified that there were several employees who started their job *after* he did and were sent to the training classes (Garcia Depo., pp. 32-38). He identified them as Matt Birendeck, Billy Decker, Ed (whose last name Garcia did not know), Jason, and James "the older guy, and I forgot his last name, but I suppose he is still working there" (Doc. 39-5, p. 10; Garcia Depo., p. 36).

This recounting of technicians who were sent to training classes does not constitute "evidence of systemically better treatment of employees outside the protected class." *Montgomery*, 626 F.3d at 393. The record does not provide the key details such as who was or wasn't Hispanic and who was or wasn't qualified for Catch Up training (such

that one could deduce that TA was treating another employee better than Garcia).  Just as in **Montgomery,** Garcia's "proffered circumstantial evidence does not point to a discriminatory reason for [the employer's] action," and Garcia "cannot survive summary judgment under the direct method of proof" for his race-based failure-to-train claim.[6]  Garcia purported "direct evidence" of race-based failure to train falls short.

As the Seventh Circuit summarized a plaintiff's failure to prevail under the direct method of proof in an age discrimination case five weeks ago*: "*he has pointed to no evidence that would raise an inference that the Department failed to transfer him because of his age, and we can find none. Without some minimal showing that the 'real reason' for cancelling his transfer was based on age, Van Antwerp's direct claim fails." ***Van Antwerp,*** **2010 WL 4923560 at 3.**   The same can be said of Garcia's proof of race discrimination in the case *sub judice*.

Garcia fares no better under the <u>indirect method of proof on his failure-to-train claim</u>.  To withstand summary judgment under the indirect method with its "barnacle-laden burden-shifting framework,"***Grigsby v. LaHood,* – F.3d –, 2010 WL 4923568, \*3 (7th Cir. Dec. 6, 2010)**, the plaintiff first must establish a prima facie case by

---

[6]     Garcia protests that he never knew about the alternative training via the ASE certification until about three months before he was fired.  But he admits that Kevin Spain did advise him of this method of advancing to Tech 3 (with the higher commission percentage).  Garcia knew that the ASE tests were offered in both English and Spanish, and knew the tests were offered in the Spring and Fall.  He never requested the study guide, and never took this route to secure the promotion (*see* Garcia Depo., pp. 37-41, 244-245).

showing the following:  (1) he is a member of a protected class, (2) his job performance met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) a similarly situated individual outside his protected class was treated more favorably. *Egonmwan*, **602 F.3d at 849-50.**

That standard has been tailored in the context of discrimination claims based on an employer's failure to train an employee.  A prima facie case of discrimination via failure-to-train requires the plaintiff to show:  (1) he belongs to a protected group, (2) his employer provided training to its employees, (3) he was eligible for that training, and (4) he was denied training that was given to other similarly situated employees outside the protected group.  *Pafford v. Herman*, **148 F.3d 658, 667 (7th Cir.),** *cert. denied*, **525 U.S. 1020 (1998).**  To survive summary judgment on this prima facie case, the plaintiff must simply identify "a genuine issue of material fact regarding these elements." *Norman-Nunnery v. Madison Area Technical College*, **625 F.3d 422, 431-32 (7th Cir.  2010).**

If the plaintiff meets this burden, an inference of discrimination arises – "an inference which can be dispelled if the employer offers a non-discriminatory, legitimate reason for the personnel action." *Grigsby* **at *3,** *citing Stockwell v. City of Harvey*, **597 F.3d 895, 901 (7th Cir. 2010).**  If the employer does so, the plaintiff/employee then must show that the proffered reason actually is mere pretext for illegal discrimination. *Id., citing Adelman-Reyes v. Saint Xavier University*, **500 F.3d 662, 666 (7th Cir. 2007).**

Garcia is a member of a protected class, and TA provides training to its employees.  But even if the Court assumes that Garcia was "eligible" for the training he

wanted (there is a solid argument to the contrary; *see* Doc. 39, pp. 6-8), Garcia has not shown that he was denied training provided by TA to similarly situated technicians outside his protected class, as discussed above.  Which brings the Court to Garcia's claim that he was improperly discharged from employment with TA on the basis of his race.

▶        PLAINTIFF'S DISCRIMINATORY DISCHARGE CLAIM

For the same reasons explained in assessing the failure-to-train claim, Garcia's proof of discriminatory discharge under the direct method fails.  The tasteless racially derogatory statements allegedly made by Spain and Chambliss were not statements of (and cannot be imputed to) the persons who made the decision to fire Garcia.

The undisputed facts reveal that the decision to discharge Garcia was made by Mark Camp and Roger Lister alone (*see, e.g.,* Lister Depo. pp. 50-54, 65).  Lister testified specifically that Camp recommended Garcia be fired, and Lister "agreed with him that we needed to terminate his employment" (Lister Depo., p. 51).  Howard Chambliss was not part of that conversation (*id.*).

In the immediate wake of the oil plug incident, Lister instructed Chambliss to "pull all the checklists and the work order and find out who did the oil change" (*id.*, p. 53).  Chambliss complied with this directive, pulled the paperwork, and reported back to Lister that Garcia was the tech, and "the checklist was not properly filled out; there was no second set of initials on it" (*id.*).   Lister's boss (Camp) "said that we need to terminate [Garcia]," and Lister agreed (*id.,* pp. 53-54).  Chambliss was not asked to weigh in or participate in that decision.  He simply gathered and forwarded the information he was

told to get, without skewing it against Garcia in any way.

Indeed, the only evidence of comment by Chambliss to Lister was Chambliss' email pointing out that Garcia had been a "great employee" with good sales and solid evaluations (arguably *pro*-Garcia remarks, although inconsequential in the decision-making process). The record is utterly devoid of evidence that Chambliss (or Spain) supplied bad information to Lister , omitted facts, or in any way attempted to mislead those who made the decision to discharge Garcia.

Neither Chambliss nor Spain influenced the decision to fire Garcia. Their comments about Garcia's race cannot be imputed to TA. Plaintiff has no presented no direct evidence of race-based employment termination.

Nor can Plaintiff withstand summary judgment on his <u>discriminatory discharge claim under the indirect method</u>. Under the burden-shifting indirect method of proof, a Title VII plaintiff must make a prima facie case of discrimination by showing: (1) he belongs to a protected class, (2) he performed his job according to his employer's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) he was treated less favorably than similarly situated employees outside the protected class. *Patterson v. Indiana Newspapers, Inc.*, **589 F.3d 357, 364 (7th Cir. 2009).** *Accord Egonmwan*, **602 F.3d at 849-50.**

If the Plaintiff makes this showing, the burden shifts to the employer to set forth a legitimate, nondiscriminatory reason for its employment decision. *Id.*, *citing Nichols v. Southern Illinois University-Edwardsville*, **510 F.3d 772, 784-85 (7th Cir. 2007).**

If the employer makes that showing, the burden shifts *back* to the employee to explain why the proffered justification is pretext for discrimination. ***Id., citing Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 859-60 (7th Cir. 2008).**

Garcia has not made a prima facie case of race discrimination here. He is a member of a protected class, and he suffered an adverse employment action (his termination). But, construed in the light most favorable to Garcia, the record does not reveal that his job performance met TA's legitimate expectations. It is undisputed that TA incurred a warranty claim of over $10,000 in replacing the engine of Tractor #16021 after Garcia performed an oil change on that truck. It is undisputed that Garcia did not follow company policy in having a second technician initial the checklist verifying proper tightening of the oil pan plug. Garcia himself acknowledged that his work that day – the oil change in question – fell below expected standards at TA. He testified: "My work was excellent at TA, very excellent" until the day that "[I] did something terrible that would cost TA so much money" (Doc. 39-5, p. 44; Garcia Depo. p. 172).

The Court also finds that Garcia failed to meet the fourth prong of his prima facie case – identifying similarly situated non-Hispanic employees who were treated more favorably. TA correctly notes that Garcia has not pointed to any similarly situated employee outside his protected class who engaged in the same conduct he did and was treated better than he was. *See Everroad,* **604 F.3d at 477-78 ("Everroad was not meeting her employer's legitimate expectations if she was insubordinate; ... and Everroad is similarly situated only to other insubordinate employees.").** In fact, the evidence before

the Court revealed no other TA Tech whose oil change work resulted in a warranty claim, as had Garcia's (*see* Lister Declaration, Doc. 39-10, p. 1; Garcia Depo., p. 87).

Assuming, *arguendo*, that Garcia made his prima facie case and the burden shifted to his employer, TA countered with a legitimate nondiscriminatory reason for firing him (the failure to follow company policy in doing the oil change on Tractor #16021), and Garcia has not shown that this reason for discharge was pretextual. Garcia cannot withstand summary judgment on his discriminatory discharge claim.

Garcia has not carried his burden of proof under the indirect method or the direct method of proving his Title VII claims. On both Garcia's failure-to-train claim and his discharge claim, no genuine issues of material fact remain, and TA is entitled to judgment as a matter of law.

As noted in footnote one, the briefs also reference (without discussing in any detail or differentiating from the Title VII claims) a state-law claim based on the Illinois Human Rights Act (IHRA). The IHRA, 775 ILCS 5/1-101, *et seq.*, was enacted to secure for individuals in Illinois freedom from unlawful discrimination in connection with employment, real estate transactions, access to financial credit, and availability of public accommodations. **Blount v. Stroud, 904 N.E.2d 1, 6 (Ill. 2009).** To accomplish this objective, the IHRA created a Department of Human Rights (to investigate charges brought by aggrieved parties claiming civil rights violations) and a Human Rights Commission (to review Department decisions and adjudicate complaints). **Id., 904 N.E.2d at 7.**

The IHRA provisions – together with the regulations and rules implemented

thereunder – "establish comprehensive administrative procedures governing the disposition of alleged civil rights violations" in Illinois.  *Id.*   The IHRA gives the Illinois Department of Human Rights (IDHR) 365 days in which to issue a report following the proper filing of a charge.  If no report is issued within that time frame, the charging party has 90 days to file a complaint with the IDHR or a civil lawsuit.  ***McCarrell v. Wirtz Beverage Illinois, LLC.*, – F.3d –, 2010 WL 3548004, \*1 (N.D. Ill. Sept. 7, 2010),** *citing* **775 ILCS 5/7A-102(G)(1)**.

Generally, an employee must exhaust administrative remedies provided by the IHRA before filing suit. ***See, e.g., Elgin v. Waste Management of Illinois, Inc.*, 810 N.E.2d 658 (Ill. App. 2004);  *Akins-Brakefield v. Philip Environmental Services Corp.*, – F.Supp.3d –, 2010 WL 1032632 (S.D. Ill. March 17, 2010); *Yucas v. People's National Bank*, – F.Supp.3d –, 2010 WL 1416140 (S.D. Ill. April 1, 2010).**

Defendant TA asserts: "Plaintiff's IHRA claim fails as a matter of law herein because Plaintiff has not, and cannot, allege that he exhausted his administrative remedies as is required under the IHRA" (Doc. 38, p. 2).  TA explains (Doc. 39, p. 26) that although Garcia filed a charge with the IHRA on August 12, 2008, filed an amendment to that charge on July 27, 2009, and received a right-to-sue letter from the United States Equal Employment Opportunity Commission (EEOC) in mid-September 2009, Garcia's claim was not resolved by the IDHR prior to filing suit in this Court, so he did not exhaust administrative remedies as required.

Garcia attached his discrimination charge and amended discrimination

charge to the complaints filed in this Court.  His charges were filed with the IDHR and the EEOC (Docs. 21-1, 21-2).[7]  The EEOC issued a right-to-sue notice on September 14, 2009, checking the boxes indicating: "More than 180 days have passed since the filing of the charge," and "The EEOC is terminating its processing of this charge."  The notice cautioned that any Title VII suit must be filed within 90 days of receipt of the notice (Doc. 21-3), and that happened.  Garcia filed his lawsuit was filed within 90 days of receiving his right-to-sue letter (the original complaint was filed December 8, 2009).

But TA contends that the December 2009 lawsuit was filed before the IDHR *resolved* Garcia's IHRA claim, so exhaustion was <u>not</u> complete.  TA says Garcia *withdrew* his IDHR charge on August 5, 2009 (Doc. 39, p. 26), *before* the IHRA completed its process.  The record before this Court does not contain the letter or document reflecting Garcia's withdrawal of the charge.  Garcia acknowledges that he "voluntarily withdrew his charge from the Illinois Department of Human Rights" but maintains that is no bar to this suit, because the IHRA requires only that a plaintiff file a charge with the IDHR and "wait the prescribed period of time before filing suit" (Doc. 44, p. 16).

---

[7]     Under the "dual filing system" of 42 U.S.C. § 2000e-5(e)(1), filing a Title VII-based claim with the EEOC is considered to constitute filing with the corresponding state agency, *and vice versa*.  "Hence, after filing a charge with the IHRA (and also, effectively, with the EEOC), assuming the IHRA resolved the dispute in the employer's favor, a claimant would then have the option of either appealing the IHRC's denial of relief to an Illinois circuit court, *or*, after obtaining a right-to-sue letter from the EEOC, suing his employer in a federal district court."  ***Garcia v. Village of Mount Prospect***, **360 F.3d 630, 642-43 n.13 (7th Cir. 2004).**

Carefully scrutinizing the amended complaint, the Court cannot discern a separate IHRA claim – only two Title VII claims of race discrimination, one based on failure to train Garcia and one based on Garcia's discharge.  Yes, the one-sentence "Nature of the Action" references the IHRA, but the meat of the complaint (and the bulk of the extensive briefing) is all Title VII.

Garcia alleges that this action "is authorized and instituted pursuant to Title VII" (Doc. 21, p. 1), Defendant is an employer within the definition of Title VII (*id.*, p. 2), Defendant terminated his employment "in violation of 42 U.S.C. § 2000(e)" (*id.*, p. 3), the conduct of "Defendant's supervisor ... constitutes race discrimination in violation of Plaintiff's rights under ... Title VII" (*id.*, p. 5), and the Court should "declare the actions of Defendant to be in violation of Title VII" (*id.*, p. 5).  The complaint pleads only race discrimination under Title VII.  And as delineated above, the Title VII claims cannot withstand summary judgment.   To the extent the amended complaint contains an IHRA claim, the Court **DISMISSES** that claim **without prejudice**.

D.     <u>Conclusion</u>

In ruling on a summary judgment motion, the District Court must construe the facts in the light most favorable to the nonmovant, drawing all reasonable inferences and resolving all doubts in favor of that party.  ***Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 628 (7th Cir. 2006).**  Having done so, the Court finds that no genuine issues of material fact remain, and TA is entitled to judgment as a matter of law on Garcia's Title VII claims.

Accordingly, the Court **GRANTS** TA's motion for summary judgment (Doc. 38) and **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant TA and against Plaintiff Garcia on his Title VII claims.  The grant of summary judgment results in the cancelling of all settings herein, including the January 21, 2011 final pretrial conference and the January 24, 2011 trial.

IT IS SO ORDERED.

DATED January 12, 2011.

s/ Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge